**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BONNIE POTTS, | ) | CASE NO. 5:15-CV-676 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | MAGISTRATE JUDGE VECCHIARELLI |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) ) | **MEMORANDUM OPINION AND ORDER** |

 Plaintiff, Bonnie Potts ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

 On November 13, 2007, Plaintiff filed her application for POD and DIB, alleging a disability onset date of August 31, 1998. (Transcript ("Tr.") 10.)  The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.*)  On March 31, 2010, an ALJ held Plaintiff's hearing.  (*Id.*)  On July 29, 2010, the ALJ found Plaintiff not disabled. (Tr. 16.)  The Appeals Council denied Plaintiff's request for review. (Tr. 1.)  Plaintiff filed a complaint

with the this Court challenging the Commissioner's final decision, and the Court remanded the case to the agency. (Tr. 446.)

On July 10, 2013, an ALJ held a second hearing. (*Id.*) Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id.*) A vocational expert ("VE") and a medical expert ("ME") also participated and testified. (*Id.*) On August 29, 2013, the ALJ found Plaintiff not disabled. (Tr. 446-59.) On March 9, 2015, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 414.) On April 7, 2015, Plaintiff filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 18.)

Plaintiff asserts the following assignments of error: (1) the ALJ erred in concluding that Plaintiff did not meet or medically equal Listing 1.04(A); and (2) the ALJ erred in evaluating Plaintiff's complaints of pain.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in November 1969 and was 41-years-old on the date last insured. (Tr. 457.) She had at least a high school education and was able to communicate in English. (*Id.*) She has past relevant work as a clerical worker, merchandise deliverer, cashier or wrapper, and a stock clerk. (*Id.*)

### B. Medical Evidence

#### 1. Medical Reports

In October 2000 Plaintiff complained of low back pain, pain in her right hip, and

right leg numbness. (Tr. 238.) An October 2000 MRI of Plaintiff's lumbar spine showed a moderate disc bulge at L4-5 with disc space narrowing and a herniated nucleus pulposus at L5-S1 appearing to impinge on the S1 nerve root. (*Id.*) That month Douglas Ehrler, M.D., performed spinal surgery (Tr. 256.) Two weeks after surgery, on November 14, 2000, Plaintiff told Dr. Ehrler that she had 100 percent relief of her pain with some remaining numbness and tingling in her leg. (Tr. 253.)

Approximately three years later, on October 22, 2003, Plaintiff presented to Mark Weiner, M.D., for severe left leg pain that began the previous month. (Tr. 313.) On physical examination she had a positive straight leg raising test. (*Id.*) Dr. Weiner recommended spinal surgery. (*Id.*) An October 23, 2003 MRI of the lumbar spine revealed a mass, presumed to be a meningioma; a moderate L4 disc herniation; and a large L5 disc herniation with displacement of the left S1 nerve root. (Tr. 248.) Plaintiff underwent a second spinal surgery on October 24, 2003. (Tr. 242.) By November 2003, Dr. Weiner opined that Plaintiff was doing "extremely well." (Tr. 317.) Her left leg and back pain were resolved. (*Id.*) Plaintiff's only complaint was tightness in her left calf, which Dr. Weiner attributed to immobility and instructed Plaintiff on home exercises. (*Id.*)

Plaintiff returned to Dr. Weiner in January 2004. (Tr. 316.) Plaintiff reported that she had a limp and her left leg cramped after prolonged walking. (*Id.*) On examination, however, she did not demonstrate any "painful behavior" and walked without a limp. (*Id.*) Dr. Weiner prescribed physical therapy. (*Id.*) Plaintiff completed half of her prescribed physical therapy sessions and transferred into a fitness program. (Tr. 315.)

3

In April 2004, Plaintiff told Dr. Weiner that she was doing quite well, although she occasionally experienced back pain after "being upright" for a long time. (Tr. 314.) She had some pain in her left leg, but her gait was normal. (*Id.*) Dr. Weiner recommended that Plaintiff wear a back support when walking for an extended time period. (*Id.*)

In November 2005, Plaintiff presented to the emergency room with complaints of upper back pain that had lasted for four days. (Tr. 295.) Plaintiff said that the pain began after she was lifting things while helping her son move. (*Id.*) On physical examination, Plaintiff's senses, gait, strength, and range of motion were normal. (*Id.*) There was tenderness to palpation in her upper-middle back. (*Id.*) She was prescribed pain medication and an anti-inflammatory drug. (Tr. 296.)

During June 2007, Plaintiff sought medical attention for left elbow pain and numbness after shoveling dirt in connection with a driveway installation. (Tr. 343.) In January 2008, Plaintiff presented to Mark Hostettler, M.D., for a lump on her knee that developed after she cleaned while kneeling down. (Tr. 345.)

Plaintiff returned to Dr. Hostettler in June 2008 seeking a statement of complete disability. (Tr. 379.) She reported significant low back pain after picking up sticks or grooming her dog. (*Id.*) She had no radicular pain or accompanying bladder or bowel symptoms. (*Id.*) Dr. Hostettler reassured Plaintiff that she did not fit any permanent disability criteria. (*Id.*) An August 2008 MRI of Plaintiff's thoracic spine showed suggestions of hemangiomas at T-8 and T-12, but no evidence to suggest significant disc disease or acute pathology. (Tr. 382.) After reviewing the MRI, Dr. Hostettler referred Plaintiff to pain management. (Tr. 377.) On November 5, 2009, Plaintiff

4

complained of progressive inability to tolerate back and radicular pain to Dr. Hostettler. (Tr. Tr. 376.) The doctor again referred her to pain management. (*Id.*)

Plaintiff treated with pain management specialist Amgad Labib Takla, M.D., in December 2009. (Tr. 373.) Plaintiff complained of mid-back pain radiating to her lower extremities with some muscle cramping and foot and toe numbness. (Tr. 370.) During a physical examination, Plaintiff's muscle strength was normal in all extremities. (Tr. 371.) Her light touch perception was somewhat diminished in the L5-S1 dermatomal distribution on the left side and in her toes on both sides. (*Id.*) Plaintiff also displayed tenderness in her thoracic and lumbar spine. (*Id.*) Dr. Takla diagnosed degenerative lumbar disc disease, lumbar facet osteoarthropathy, failed back syndrome, and myofascial pain syndrome. (Tr. 371-72.) The doctor recommended Tramadol as needed, an anti-inflammatory, a prescription sleep aid, a lumbar spine MRI, and epidural steroid injections. (Tr. 372.)

In January 2010, Plaintiff underwent epidural steroid injections. (Tr. 369.) A June 2010 electromyographic (EMG), or nerve conduction, study was normal and showed no evidence of lumbosacral radiculopathy, peripheral polyneuropathy, or myopathy. (Tr. 392.) A July 2010 lumbar spine MRI revealed that Plaintiff's L4-L5 disc pathology had progressed since her previous MRI. (Tr. 389-90.) There was a superimposed extrusion on the previously seen protrusion, with an increase in spinal stenosis and an increase in impingement of the descending left L5 nerve root. (Tr. 390.)

Plaintiff underwent a third spinal surgery on August 19, 2010. (Tr. 402.) On September 1, 2010, Plaintiff presented to Dr. Weiner after falling and hurting her back. (Tr. 805.) She was concerned about the fall but was improving from surgery and in less

5

pain. (*Id.*) On September 16, 2010, Plaintiff reported to Dr. Takla that she was in a car accident seven days after her spinal surgery. (Tr. 412.) She had lower back pain that radiated down her left leg. (*Id.*) On examination, Plaintiff's light touch perception was diminished down her legs, but it did not follow a specific dermatomal distribution. (*Id.*) Dr. Takla prescribed pain medication. (*Id.*) In November 2010, Plaintiff told Dr. Takla that she had lower back pain radiating down both extremities with some new discomfort below her right knee. (Tr. 410.) On examination, Plaintiff's muscle strength in all extremities was normal and her light touch perception was intact. (*Id.*)

During February 2011, Plaintiff reported continuous pain at a level four on a scale of ten that was mainly between her shoulder blades and low back. (Tr. 408.) She also described numbness in both legs from the knee down to the ankle along with cramping and aching. (*Id.*) Nonetheless, Plaintiff experienced much less pain than she had before her last spinal surgery. (*Id.*) Dr. Takla adjusted Plaintiff's pain medications and advised her to repeat epidural steroid injections if necessary. (*Id.*) The next month Plaintiff reported significant improvement in pain after a steroid injection. (Tr. 685.) She denied any new weakness or numbness in her lower extremities. (*Id.*) Dr. Talka administered another steroid injection. (*Id.*) In June 2011, Plaintiff reported a 50 percent improvement in right leg spasms since the beginning of her series of injections. (Tr. 683.) On examination, Plaintiff had full strength and no evidence of light touch perception deficits, except in the L5-S1 dermatomal distribution. (*Id.*)

A May 2012 MRI showed a left disc protrusion at L4-L5 impinging on the descending L5 nerve root. (Tr. 756.) Plaintiff underwent a fourth spinal surgery on May

11, 2012. (Tr. 745.) On May 22, 2012, Plaintiff returned to pain management and rated her pain at a one on a scale of ten. (Tr. 670.) On examination, straight leg raise tests were negative. (*Id.*) In June 2012, Dr. Weiner opined that Plaintiff was "doing quite well" since her surgery. (Tr. 800.) Plaintiff's left leg pain was gone, though she complained of hip, groin, and knee pain. (*Id.*)

In February 2013, Plaintiff complained to Dr. Weiner of persistent back and leg pain. (Tr. 795.) Plaintiff also reported that she had been busy caring for her mother-in-law who had passed away. (*Id.*) Plaintiff's physical examination was generally unremarkable. (Tr. 796-97.) An August 2013 EMG of the legs yielded normal results. (Tr. 841.)

### 2. Agency Reports

On January 24, 2008, state agency physician Paul Scheatzle, D.O., examined Plaintiff. (Tr. 346-51.) Plaintiff reported that following her second spinal surgery, she assisted her husband with his trucking business until October 2007. (Tr. 350.) Plaintiff complained of severe low back pain with numbness down both legs. (*Id.*) She took Advil and Celebrex on an as-need basis. (*Id.*) On physical examination, Plaintiff exhibited no pain behaviors. (*Id.*) Plaintiff had tenderness to palpation over the posterior superior iliac spine (PSIS), sacroiliac (SI) joint, and knees. (Tr. 351.) She had trigger points in her calves. (*Id.*) Her gait was slightly antalgic and her range of motion in her lumbar spine was decreased. (*Id.*) Her straight leg raising tests were negative. (*Id.*) She tested positive for pain in the bilateral PSIS and SI joint regions. (*Id.*) She transferred on and off the examination table slowly with complaints of low back pain

7

down the left leg. (*Id.*)

Dr. Scheatzel opined that Plaintiff could sit for an unlimited period of time. (Tr. 351.) She could frequently stand with a change in position every 30 minutes and walk for one city block with a stop for rest. (*Id.*) She could lift and carry up to 20 pounds occasionally or 10 pounds frequently. (*Id.*) Plaintiff could not perform repetitive bending, twisting, climbing, or crawling. (*Id.*)

In February 2008, state agency physician Jon Starr, M.D., reviewed the record. (Tr. 352-59.) He opined that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently. (Tr. 353.) Plaintiff could stand, walk, or sit for up to six hours in an eight-hour workday. (*Id.*) She could occasionally climb ramps and stairs, stoop, balance, kneel, crouch, and crawl. (Tr. 354.) She could never climb ladders, ropes, or scaffolds. (*Id.*)

**C. Hearing Testimony**

**1. Plaintiff's Hearing Testimony**

During an administrative hearing held in July 2013, Plaintiff testified that her last job involved working for her husband's trucking company performing clerical-type duties until October 2007. (Tr. 473.) Plaintiff also assisted by greasing a truck. (Tr. 478.) Plaintiff underwent four back surgeries between October 2000 and May 2012. (Tr. 479.)

On some days Plaintiff's pain was very mild and other days it made her "sick to her stomach." (Tr. 483.) Plaintiff's pain remained in her back at times and did not radiate into her legs. (Tr. 485.) Steroid injections provided a week of pain relief. (Tr. 487-88.)

8

Plaintiff could sit for up to one hour without changing positions. (Tr. 488.) She could not stand for long periods of time and washed dishes in stages. (Tr. 488-89.) Plaintiff could shop for groceries, but her husband would pick up the groceries for her. (Tr. 489.) Plaintiff's physician did not recommend further surgery even though she had a disc bugle, because the bulge was not pinching a nerve. (Tr. 487.)

### 2. Medical Expert's Hearing Testimony

Dr. Sklaroff, a medical expert, testified at Plaintiff's hearing. The ME considered Listing 1.04(A) and concluded that Plaintiff did not meet or medically equal the requirements of the listing. (Tr. 495.) The ME testified that Plaintiff did not have a dermatome,[1] but instead experienced post-operative pain involving the L4-5 area. (Tr. 491.) The ME explained that a treatment record from a March 19, 2013, examination showed no evidence of light touch perception deficits in Plaintiff's lower extremities. (*Id.*) The record showed some decreased light touch in the left, more so than the right, but affecting the overall area rather than in any specific dermatome distribution. (*Id.*) The ME also referenced a May 2012 treatment record that showed no muscle weakness as Listing 1.04(A) required. (Tr. 493.) Finally, the ME noted that Plaintiff's 2010 EMG showed no nerve issues. (Tr. 495.)

Plaintiff's counsel asked the ME whether a February 2011 treatment note evidenced a dermatome distribution to Plaintiff's pain. (Tr. 497.) The record stated that Plaintiff had decreased sensation at the L5-S1 dermatome distribution. (*Id.*) The ME

---

[1] The ME defined the term "dermatome" as the relationship between a nerve at a specific spinal level and symptoms at the part of the body that the nerve eventually reaches. (Tr. 499-500.)

9

responded that the evidence was somewhat inconsistent and not associated with a muscular component. (*Id.*)  The ME further explained that Plaintiff's symptoms were insufficient to warrant any kind of intervention. (Tr. 497-98.)  In addition, any purported issue did not translate into motor problems and there were no sensory findings. (Tr. 498.)

Plaintiff's counsel also asked the ME whether a finding of delayed speed in the dermatome affecting L4 and S5 down the leg was determinative of meeting the listing in this case. (Tr. 500.)  In response the ME explained that the issue came down to whether or not there was radiculopathy as defined in 1.04(A), of which the dermatome was a component. (*Id.*)  The ME further explained that Plaintiff did not have radiculopathy because Plaintiff's 2010 EMG returned negative. (*Id.*)  The ME noted that at the time of the hearing, the 2010 EMG was the most recent nerve study in the record, and he opined that the test results could be considered as a baseline for Plaintiff's condition. (Tr. 495.)  The ME advised that if there was a further question as to the nature of Plaintiff's condition, she should have another EMG. (Tr. 495, 498.)

### 3. Vocational Expert's Hearing Testimony

Barbara Burke, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 504.)  The individual could perform sedentary work with the ability to alternate positions every 30 minutes to an hour as needed throughout the workday, but would be expected to remain on task. (*Id.*)  The individual could occasionally climb ramps and stairs; never climb ropes, ladders, or scaffolds; occasionally balance, stoop,

kneel, crouch, and crawl; and have no exposure to unprotected heights or moving mechanical parts. (*Id.*)  The VE testified that the individual would be able to perform such jobs as a cashier, small products assembler, and a telephone solicitor. (Tr. 505.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a

severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirement of the Social Security Act on September 30, 2011.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 31, 1988, through her date last insured of September 30, 2011.

3. Through the date last insured the claimant had the following severe impairments: status post laminectomy syndrome, lumbar spine; and left knee bursitis.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except the ability to alternate positions every 30 minutes to one hour as needed throughout the workday but would be expected to remain on task; occasional climbing ramps and stairs, but no

  climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and no exposure to unprotected heights or moving mechanical parts.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7. The claimant was born on November 25, 1969, and was 41 years old, which is defined as a younger individual age 18-44, on the date last insured.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 31, 1998, the alleged onset date, through September 30, 2011, the date last insured.

(Tr. 448-58.)

### V. LAW & ANALYSIS

#### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in

13

the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.     Plaintiff's Assignments of Error**

    **1.     Listing 1.04(A)**

Plaintiff argues that she meets or medically equals Listing 1.04(A) and points to evidence in support of this conclusion. The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff did not meet the requirements of the listing. For the reasons that follow, Plaintiff's arguments are not well taken.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing

14

20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment.  *Id.* at 415; *Hunter v. Astrue*, No. 1:09-CV-2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011) (Oliver, J.); *May v. Astrue*, No. 4:10-CV-1533, 2011 WL 3490186, at *8-9 (N.D. Ohio June 1, 2011) (White, M.J.).  Nevertheless, it is the claimant's burden to show that she meets or medically equals[2] an impairment in the Listings.  *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (per curiam).

> Listing 1.04(A) addresses disorders of the spine and requires:
>
> > Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> >
> > A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

---

2   A claimant may be found disabled if her impairment is the *medical equivalent* of a listing.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  This means that the impairment is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a); 20 C.F.R. § 404.1526(a).  An ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any listed impairment.  *Cf. Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 529 (6th Cir. 2006) (upholding ALJ who "compar[ed] the medical evidence of Lawson's impairments with the requirements for listed impairments contained in the SSA regulations").

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04(A).

In support of her argument, Plaintiff asserts that there is evidence of a herniated disc, left leg radiculitis, lower back pain, limited range of motion in the spine, involuntary guarding of paraspinal muscle, an antalgic gait, and a positive straight leg raising test before her 2003 surgery. (Plaintiff's Brief at 10-11, 22-23.)  Plaintiff, however, does not explain how these medical findings demonstrate any sensory or reflex loss necessary to satisfy Listing 1.04(A).

Review of the decision reveals that the ALJ considered Plaintiff's arguments. (Tr. 449.) The ALJ, however, concluded that Plaintiff's impairments were not severe enough to satisfy the listing. (Tr. 449-50.)  Substantial evidence supports this conclusion.  In making her determination, the ALJ relied on both the ME's opinion that Plaintiff failed to meet or equal the listing, as well as other medical evidence in the record.  The ALJ provided the following support for the listing determination:

- The ME referred to a treatment note from March 19, 2013, that showed no dermatome and no evidence of light touch perception deficits in Plaintiff's lower extremities.  Although there was some decreased light touch perception affecting the left more than the right area, it was not a specific dermatome distribution. (Tr. 450.)

- The ME noted that a May 2012 treatment record showed no muscle weakness. This record also showed normal tone and motor strength. (*Id.*)

- At the administrative hearing, counsel argued that there was a reference to a dermatome distribution, specifically an examination record from April 12, 2011, that stated: "[Plaintiff] has some decreased sensation to light touch affecting the bilateral aspects of her lower extremities along the L5-S1 dermatome distribution."  However, the ME responded that the finding was somewhat inconsistent and not associated with a muscular component.  He noted that Plaintiff's symptoms were insufficient to warrant any kind of intervention and did not translate into anything motor.  Furthermore, the ME stated that there were no sensory findings. (*Id.*)

16

- The ME explained that Plaintiff had a normal EMG in June 2010 that could be construed as a baseline for her current neurological issues. After the administrative hearing, Plaintiff underwent an EMG of the legs in August 2013 that was also normal. (*Id.*)

Review of the decision reflects that the ALJ thoroughly considered whether Plaintiff's impairments met or medically equaled Listing 1.04(A). The ALJ relied on substantial evidence in the record to conclude that Plaintiff failed to satisfy the listing. Accordingly, Plaintiff's arguments are unavailing.

### 2. Plaintiff's Credibility

Plaintiff argues that the ALJ failed to adequately consider her pain when formulating the RFC. Plaintiff also contends that the ALJ's credibility determination used prohibited "boilerplate language" and was insufficient. For the reasons that follow, Plaintiff's arguments are not well taken.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983). The ALJ also must provide an adequate explanation for his credibility determination. "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.). Rather, the determination "must contain

specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

A review of the ALJ's decision demonstrates that the ALJ thoroughly considered Plaintiff's pain and other symptoms when formulating the RFC. (Tr. 452-57.) The ALJ recounted and evaluated Plaintiff's statements regarding the nature and severity of her back and leg pain, her ability to perform activities, the effectiveness of treatment, and factors that precipitated Plaintiff's pain. (*Id.*) The ALJ found, however, that Plaintiff's statements regarding her pain were not fully credible. The ALJ explained:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. (Tr. 452.)

Plaintiff argues that courts have prohibited an ALJ's use of similar language, labeling it as "boilerplate" and insufficient to support a credibility determination. In support of this proposition, Plaintiff cites to *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), and *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). As an initial matter, these cases are from outside of this jurisdiction and are not binding on this Court. Nevertheless, the ALJ's analysis here is distinguishable from *Bjornson* and *Mascio*. In both of those cases, the court criticized the ALJ's use of language from a template drafted by the Social Security Administration, because the language read as follows:

18

"the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Mascio*, 780 F.3d at 693; *Bjornson*, 671 F.3d at 645. The language was improper because it implied that the ALJ first determined the claimant's ability to work and then used that determination to evaluate the claimant's credibility. *Mascio*, 780 F.3d at 693. The ALJ should compare the claimant's alleged functional limitations from pain to other evidence in the record to decide how the claimant's symptoms affect the ability to work. *Id.* The court in *Mascio* also explained that the ALJ's use of this "boilerplate language" would have been harmless had the ALJ properly analyzed credibility elsewhere in the opinion. *Id.*

In the present case, the ALJ did not indicate that she used Plaintiff's ability to work to evaluate Plaintiff's credibility. Rather, the ALJ's opinion reflects that ALJ compared Plaintiff's complaints of pain to the record as a whole and provided a number of specific, good reasons for finding that Plaintiff was not fully credible. (Tr. 452-56.) The ALJ explained:

- The record showed that Plaintiff performed activities consistent with a greater capacity than Plaintiff alleged. For example, Plaintiff shoveled dirt while installing a driveway, cleaned up after her dogs on her knees, picked up sticks, groomed her dogs, and worked in her garden on her knees. She also worked at least part time for her husband's trucking company until 2007. (Tr. 452-54.)

- While Plaintiff required several surgical procedures on her spine, her symptoms responded to treatment. For instance, after surgery in October 2000, Plaintiff reported 100 percent pain relief in her back. Following a second surgery in October 2003, Dr. Weiner reported that Plaintiff was doing "extremely well," and her left leg and back pain were gone. After surgery in January 2004, Dr. Weiner noted that Plaintiff continued doing well, had joined a fitness club, and had a nonantalgic gait. (Tr. 453.) Plaintiff underwent surgery in May 2012 and thereafter rated her pain as a "1 out of 10." On examination, her straight leg raising tests were negative and her reflexes were intact. (Tr. 456.)

- In response to Plaintiff's request that Dr. Hostettler complete a statement for disability in June 2008, the doctor reassured Plaintiff that she did not fit any of the criteria for permanent disability. (Tr. 454.)

The ALJ provided various reasonable grounds for finding Plaintiff's statements regarding her pain and other symptoms were not fully credible, and the ALJ's findings are substantially supported by the record. Accordingly, the ALJ properly analyzed Plaintiff's credibility and remand is not warranted on this issue.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

s/ *Nancy A. Vecchiarelli*<br>U.S. Magistrate Judge

Date: December 18, 2015